UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| HUNTER RHIANNON SINUHE,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 18-cv-03562-LB<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 28, 31 |

## INTRODUCTION

Plaintiff Hunter Rhiannon Sinuhe appeals a final decision by the Commissioner of the Social Security Administration denying her claim for disability insurance benefits, social-security income ("SSI"), and medical assistance under Titles II, XVI, XVIII part A, and XIX of the Social Security Act ("SSA").[1] 42 U.S.C. §§ 423, 1381, 1395, and 1396. The plaintiff moved for summary judgment, the Commissioner filed a cross-motion for summary judgment and opposed the plaintiff's motion, and the plaintiff submitted a reply to the Commissioner's cross-motion.[2] Both

---

[1] AR 216, 282. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[2] Mot. – ECF No. 28; Cross-Mot. – ECF No. 31; Reply – ECF No. 32. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

parties consented to magistrate-judge jurisdiction.[3] Under Civil Local Rule 16–5, the matter is submitted for decision by this court without oral argument. The court grants the plaintiff's motion for summary judgment and denies the defendant's motion.

## STATEMENT

### 1. Procedural History

On August 14, 2013, the plaintiff, then age 43, filed an application for disability insurance benefits under Title II and part A of Title XVIII of the SSA.[4] She also applied for SSI and medical assistance on August 16, 2013 under Title XVI and Title XIX respectively of the SSA.[5] She alleged a disability starting on December 31, 2009.[6] In her application, the plaintiff identified her disability as "mental illness."[7]

The plaintiff's application was initially denied on December 17, 2013 and on reconsideration on July 29, 2014.[8] On September 9, 2014, the plaintiff filed a written request for a hearing.[9] The ALJ E. Alis (the "ALJ") held a hearing on October 25, 2016.[10] During the hearing, the plaintiff amended her disability-onset date to August 14, 2013, the date of her disability-insurance benefits filing.[11] The administrative record remained open for submission of additional records until November 14, 2016.[12] On January 5, 2017, the ALJ issued an unfavorable decision.[13] The plaintiff

---

[3] Consent Forms – ECF Nos. 2, 13.

[4] AR 216.

[5] AR 282.

[6] AR 216, 282.

[7] AR 129.

[8] AR 18, 153, 161.

[9] AR 18, AR 167.

[10] AR 18.

[11] Mot. – ECF No. 28 at 1; AR 21.

[12] AR 18.

[13] AR 15.

requested a review of the decision on February 17, 2017, which the Appeals Council denied on March 7, 2017.[14]

The plaintiff timely filed this action for judicial review and moved for summary judgment on April 23, 2019.[15] The Commissioner filed a cross-motion for summary judgment on June 4, 2019.[16]

## 2. Summary of Administrative Record

### 2.1 Medical Records

#### 2.1.1. Orchid Women's Perinatal Treatment Services — Treating

The plaintiff entered Orchid Women's Perinatal Treatment Services ("Orchid"), a residential substance-abuse treatment program, on July 1, 2012, and completed the program on December 31, 2012.[17] During her time at Orchid, the plaintiff "willingly participated in the rigorous structure."[18] She met weekly with a counselor/case manager and continued to "process around her sexual abuse as a child, as well as her childhood issues" and "[take] an in-depth look at mistakes she had made in the past."[19] The plaintiff resided in Orchid's Sober Living Facility after completing the program.[20]

#### 2.1.2 Sausal Creek Outpatient Stabilization Clinic — Treating

On May 14, 2012, the plaintiff went to Sausal Creek on referral from Highland General Hospital for a "psychiatric eval[uation]" for chronic depr obtain a diagnosis for her SSI application.[21] The plaintiff smoked a half-pack of cigarettes a day and used cocaine for

---

[14] AR 214; Mot. – ECF No. 28 at 1.

[15] ECF 28.

[16] ECF 31.

[17] AR 303.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] AR 358, 361.

approximately 10 years, speed for 20 years, and alcohol "often."[22] In the mid-1990s, the plaintiff overdosed on a combination of her medication and alcohol in an attempt to commit suicide.[23] In 2010, she had a hysterectomy.[24]

The plaintiff identified "unhappiness, loss of interest, insomnia, [and] isolation" as factors contributing to her depression.[25] Her anxiety caused her "a lot of discomfort." [26] The plaintiff took Trazodone for depression and took a "host" of other anti-depressants.[27] Her mood was "depressed," her affect was "flat," her insight and judgment were "marginal," and her thought process was "logical."[28] Her senses were "alert," her orientation was to time, person, and place, her relatedness was "engaged," her grooming was "fair," and her speech was "slow."[29] The plaintiff had a "problem" with depression but posed no risk to herself or others.[30]

On May 15, 2012, the plaintiff presented with "depression, hopelessness, anhedonia, insomnia, [and] isolat[ion]. [She] [w]ant[ed] to go to therapy, [and did] not want to be on medications. [She felt] better when she ha[d] a drink. [She had] significant anxiety, [and] irritability, worr[ied] too much, [and had] muscle tension."[31] She was "unable to work" and "[drank] alcohol regularly, 3 glasses of wine daily."[32] Her medications did not "make a difference."[33] Dr. Emma Castro diagnosed the plaintiff with "Depressive disorder NOS [not otherwise specified], anxiety disorder

---

[22] AR 359, 361.

[23] AR 360.

[24] AR 359.

[25] AR 358. The physician's name is unreadable in the administrative record.

[26] AR 361.

[27] AR 358.

[28] AR 362.

[29] *Id.*

[30] AR 363.

[31] AR 367.

[32] AR 368.

[33] *Id.*

NOS, alcohol abuse, nicotine dependence, access to healthcare, [and] unemployment."[34] She prescribed Citalopram, continued the plaintiff's Trazodone prescription, and recommended a therapy referral.[35]

On July 6, 2012, the plaintiff said that the medications were working but asked if she could try a higher dosage.[36] A physician prescribed Colepra and Celexa, and continued Trazodone.[37] The plaintiff was discharged from Sausal Creek to Orchid House, a residential substance-abuse-treatment facility.[38]

### 2.1.3    Crisis Program, Alameda County Mental Health — Treating

On July 11, 2012, Registered Nurse ("RN") Eve Mihata reported that the plaintiff "ha[d] been trying to get meds and therapy for at least the last 6mo. and [was] thwarted due to bureaucratic practices, ie she asked Dr. Rose for a referral to ACCESS for therapy but he declined saying that he was not a psychiatrist and he didn't have the time to spend filling a 7 page form."[39] The plaintiff took Celexa and Trazodone and felt that her medications were "helpful."[40] She received food stamps and lived at Orchid House where she was "well into recovery successfully" for alcohol abuse.[41]

The plaintiff was in therapy "off and on" since her mother died when the plaintiff was 17.[42] The plaintiff graduated from college.[43] Her last gainful employment ended six years before and

---

[34] AR 369. NOS stands for "Not Otherwise Specified." *Ghanim v. Colvin*, 763 F.3d 1154, 1158 n.3 (9th Cir. 2014).

[35] AR 369.

[36] AR 375.

[37] AR 373–75. The physician's name is unreadable in the administrative record. It is unclear from the record if the attending physicians took the plaintiff off of Citalopram.

[38] AR 373.

[39] AR 377.

[40] *Id.*

[41] AR 379.

[42] AR 377.

[43] *Id.*

she was "underemployed," had only a "sporadic income, and suffered from "poor access to healthcare."[44]

The plaintiff exhibited "substantial impairment" in "[d]aily activities, including employment, household responsibilities, and attending scheduled programs."[45] She was "oriented x3 and superficially cooperative [with] the interview. Mood and affect congruent acknowledges depression. Her thoughts [were] linear and unremarkable. Denie[d] [history] of serious [mental illness] or of family [history] of [the] same."[46] The plaintiff's insight and judgment were intact and she was "above average intellectually."[47] Angela Callender, M.D., diagnosed the plaintiff with moderate Major Depressive Disorder, alcohol abuse, a "deferred" personality disorder, poor access to health care, underemployment, and a sporadic income. She assessed a score of 55 on the Global Assessment of Functioning Scale ("GAF").[48] Dr. Callender increased the plaintiff's Celexa dosage and continued her on Trazodone for sleep.[49] Dr. Callender and Nurse Mihata referred the plaintiff to Earth Circle for therapy.[50]

On July 17, 2012, plaintiff had good hygiene and "managed [her] grooming."[51] She suffered from insomnia, felt miserable and worthless, had no desire and low self-esteem, and engaged in self-deprecation.[52] She denied any suicidal or homicidal ideation.[53] In the past, she tried numerous

---

[44] AR 377–380.

[45] AR 377.

[46] AR 378.

[47] Id.

[48] AR 380. GAF scores rate a subject's mental state and symptoms. The higher the GAF rating, the better the subjects' coping and functioning skills. *See Garrison v. Colvin,* 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'").

[49] AR 379.

[50] Id.

[51] AR 381.

[52] AR 382.

[53] AR 382–83.

psychotropic medications.[54] She last worked at Peet's in 2006.[55] Her longest job was a retail

position she held for three and a half to four years.[56] The plaintiff drank one and half to two bottles

of wine every evening (and did so for the past two to three years).[57] She denied using other

drugs.[58] The plaintiff appeared cooperative and pleasant, her psychomotor activity and speech was

"WNL [within normal limits]," she did not have a movement disorder, and her mood was

dysphoric.[59] The plaintiff's orientation, recent memory, remote memory, abstract thinking, and

concentration were "WNL," her level of consciousness was alert, and her level of

intelligence/knowledge was above average.[60] Her thought process was logical, and goal oriented,

her insight was such that she "[a]ccept[ed] problems [and] want[ed] help," and her appetite,

thought content, and judgment were WNL.[61] She denied experiencing hallucinations.[62] The

plaintiff had a partial response to Celexa with no side effects, and it was unclear whether she

needed Trazodone.[63] Dr. Callender diagnosed the plaintiff with not having a "primary support

group," occupational problems, poor access to health care, and economic issues.[64] She rated the

plaintiff's GAF at 50, five points lower than the highest GAF she experienced over the past year,

and diagnosed her with depression, anhedonia, insomnia, energy loss, feelings of guilt and

worthlessness, and an alcohol-substance-abuse-disorder.[65]

---

[54] AR 382.

[55] Id.

[56] Id.

[57] AR 381.

[58] Id.

[59] Id.

[60] Id.

[61] AR 383.

[62] Id.

[63] Id.

[64] Id.

[65] AR 383–84. "A GAF of 50 reflects a serious limitation on a claimant's ability to perform basic life tasks." Cravens v. Colvin, No 13–cv–00070–NJV, 2013 WL 5781481, at n.1 (internal citation omitted).

On July 18, 2012, Nurse Mihata described the plaintiff's mood as "euthymic" and noted that she had "concerns regarding her anger and inability to function in the work world."[66] She was three weeks sober, did not express any suicidal or homicidal ideation, exhibited well-constructed thoughts," and did not show any "signs of derailment."[67] Nurse Mihata referred the plaintiff to ACCESS for therapy.[68] The plaintiff's diagnosis of "depression" made her ineligible for a discounted bus pass.[69] Nurse Mihata modified the plaintiff's diagnosis to "Major Depression."[70]

By August 7, 2012, the plaintiff was assigned a therapist.[71] The plaintiff expressed concerns about her SSI application because she received an unfavorable decision, her lawyer stopped responding to her, and she felt anxious about her petition for reconsideration.[72] Her mood "continue[d] to be depressed."[73] She was "cooperative" and acknowledged some improvement.[74] Her plan was to "[c]ontinue sobriety. Keep [p]rimary care appointment. Follow through w/SSi [sic] reconsideration."[75]

On August 7, 2012, the plaintiff had side effects from Trazodone including coughing and sneezing.[76] She did not have any side effects from Celexa and said that her depression improved by 25–33%.[77] The medication did not improve her anxiety, which included phobias of "clowns

---

[66] AR 388.

[67] *Id.*

[68] *Id.*

[69] AR 390.

[70] *Id.*

[71] AR 393.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] AR 391.

[77] *Id.*

and men."[78] The plaintiff intended to work on her anxiety in therapy.[79] Dr. Callender increased the plaintiff's Celexa prescription and discontinued her Trazodone prescription.[80]

On September 11, 2012, the plaintiff was doing well at Orchid House and was two-and-a-half months' sober.[81] She was responding to her anti-depressants, had ongoing appointments with her therapist, and was receiving her medications from her primary-care physician.[82] The plaintiff was concerned about her 2009 SSI application. [83] Nurse Mihata and the plaintiff discussed the possibility of "enlisting Mental Health Advocates who may be able to follow up [on her SSI]."[84] The plaintiff was "compliant w/her medications," "following through with [her] goals . . . [and] movi[ng] up in the program [at Orchid] where she [was] entrusted to travel independent[]ly to appointments . . . ."[85] The plaintiff was discharged from Alameda County Behavioral Health Care Services and told to continue her therapy sessions.[86] She would follow up with Nurse Mihata if she found herself in "further difficulty."[87]

On September 11, 2012, the plaintiff's mood was "OK."[88] "Some of her issues [were] stirred up [in therapy] but that's good in her estimate."[89] Dr. Callender advised the plaintiff to continue Celexa, continue therapy, and continue to visit her primary-care physician.[90]

---

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] AR 395.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] AR 394.

[89] *Id.*

[90] *Id.*

### 2.1.4    Alameda County Medical Center — Treating

From May 22, 2012 to July 22, 2013, the plaintiff was admitted the Highland Campus Emergency Department of the Alameda County Medical Center for various physical ailments.[91]

On January 28, 2013 the plaintiff saw Sharone A. Abramowitz, M.D..[92] The plaintiff told Dr. Abramowitz that she was previously treated for depression and PTSD, was emotionally abused and molested as a child, and was raped during her early twenties.[93] The plaintiff "fe[lt] triggered by men in certain con[texts], such as, male cashiers. She had a couple of past flashbacks, she avoid[ed] intimacy with men, ha[d] insomnia, and c[ould] be irritable."[94] Citalopram "allow[ed] her to tolerate being in public."[95] She was six months' sober.[96] After Orchid House, she entered an outpatient-recovery program facilitated by East Oakland Recovery, which she attended three times a week in addition to Alcoholics Anonymous ("AA") meetings.[97] Stress increased her desire to drink but this desire only surfaced about once a week.[98]

The plaintiff was "neatly groomed, cooperative, and polite."[99] Her speech was "articulate, not slow or pressured."[100] She had a "[b]road affect. Not manic. Somewhat anxious."[101] She "[s]eem[ed] committed to sobriety." [102] She had no suicidal ideation, homicidal ideation, hallucinations, or delusions currently."[103] She did not exhibit any signs of a "formal thought

---

[91] AR 401, 412, 414, 418, 420, 422, 424.

[92] AR 408.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] AR 409.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

disorder" and appeared "[g]oal directed and coherent."[104] Her judgment and insight were "good" and from a cognitive standpoint she seemed "[a]lert and oriented x3," showing no signs of "gross memory abnormalities."[105]

Dr. Abramowitz diagnosed the plaintiff with PTSD, "[a]lcohol dependence," a [h]istory of childhood and adult abuse," and "[s]tatus post hysterectomy in 2010 and anemia."[106] The plaintiff did well with psychotherapy in the past, "want[ed] more session[s] via [the hospital's Health Professions Advisory Committee, or "HPAC"]," and "need[ed] a social worker to complete the HPAC re-application."[107] The plaintiff used to take Trazodone, which left her feeling sedated, and Amitriptyline, which was unhelpful.[108] Dr. Abramowitz prescribed Gabapentin for anxiety management and alcohol recovery and continued her on Citalopram for sleep.[109] She recommended that the plaintiff's primary-care physician prescribe Naltrexone if she started craving alcohol.[110] Dr. Abramowitz referred the plaintiff to Keturah Hood, MSW, so that the plaintiff could continue working with her psychotherapist through HPAC.[111] Because of the plaintiff's mood disorder and alcohol history, Dr. Abramowitz recommended that the plaintiff's "thyroid function test, her B12, folate, her liver functions tests, [] her lipids," and her "MCV, LFTs, and triglycerides" be checked because "if they have gone down, [that could] possibly reinforce[] her sobriety."[112]

On June 14, 2013, the plaintiff was "neatly groomed, [had a] broad affect, stable mood, [and] mild anxiety with some dysthymia, as [she] face[d] emotions without use of alcohol." [113] She

---

[104] *Id.*

[105] AR 409–10.

[106] AR 410.

[107] *Id.*

[108] AR 409.

[109] AR 410.

[110] *Id.*

[111] *Id.*

[112] AR 410–11.

[113] AR 403.

"denie[d] significant alcohol cravings."[114] Her affect regulation in particular proved difficult "as she face[d] life clean and sober."[115] The plaintiff attended AA meetings three times per week, was working with a sponsor, and saw her therapist every other week.[116] She was living in a sober environment.[117] Her boyfriend was in jail.[118] The plaintiff took Gabapentin for anxiety, which, along with Citalopram, appeared to be controlling some of her symptoms.[119] Dr. Abramowitz increased the plaintiff's Gabapentin dosage to help her "cope with affect regulation while sober" and taught her some abdominal breathing techniques.[120] She continued the plaintiff's Citalopram prescription and referred her to East Bay Meditation Center.[121]

On August 14, 2013, Babaria Palav, M.D., reported that the plaintiff felt well overall but "continue[d] to have some poor sleep."[122] Melatonin alleviated her insomnia "intermittently" and she drank coffee "numerous" times throughout the day, finishing her final cup around 6 or 7 p.m. each night.[123] Dr. Palav counselled "improved sleep hygiene," including avoiding caffeine late in the day.[124] The plaintiff was one year sober and attended AA meetings.[125] She took Citalopram for depression and said that it was becoming increasingly less effective.[126] The plaintiff requested a behavioral-health referral, and Dr. Palav directed her to Dr. Abramowitz.[127] The plaintiff was

---

[114] Id.

[115] Id.

[116] Id.

[117] Id.

[118] Id.

[119] Id.

[120] Id.

[121] AR 404.

[122] AR 398.

[123] Id.

[124] AR 400.

[125] AR 398.

[126] Id.

[127] AR 399.

nearing the end of her twelve insurance-approved therapy sessions.[128] Dr. Palav agreed to help contact her insurance to see whether the plaintiff could secure coverage for an additional few months of therapy.[129]

### 2.1.5    Lesleigh Franklin, Ph.D. — Examining

On December 13, 2013, Elizabeth Walser, MSW, Psy.D., examined the plaintiff, and Lesleigh Franklin, Ph.D., supervised and made the final determination about the plaintiff's "current cognitive and emotional functioning."[130]

The plaintiff was an only child. "Her mother reportedly expressed negative feelings about being a parent, and [the plaintiff] felt unloved and unwanted."[131] She was bullied because of her ethnicity and was "targeted within her own family."[132] "Her cousins made fun of her and picked on her. One cousin sexually abused her. This occurred on multiple occasions."[133] She did not tell her parents about the assault because she feared her mother would blame her and her father would be "disappointed in her."[134]

The plaintiff's mother died of cancer when she was a teenager.[135] She became depressed and dealt with "severe" anxiety and grief but did not seek treatment.[136] Her anxiety heightened after she was raped at age twenty-one and she started experiencing panic attacks and attempted to commit suicide.[137] She received SSI for her depression in the 1990s.[138] In her twenties, she

---

[128] *Id.*

[129] *Id.*

[130] AR 462.

[131] AR 463.

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] AR 462–63.

[138] AR 462.

received treatment at Oakland Therapy and Bay Area Women Against Rape (BWAR).[139] In her thirties, she developed depressive symptoms and started drinking to "[calm] down enough so that she could date."[140] This led to "some risky sexual behaviors."[141] In 2012, she entered Orchid Women's Recovery Center and, after graduating, entered a sober-living program that offered her "weekly case management support."[142] As of December 2013, she was seventeen months' sober and regularly attended AA meetings.[143]

The plaintiff got her AA from the Art Institute in Denver and her BA in 2008.[144] She had summer jobs during high school and worked "at a photo lab and a second hand clothing store" during college.[145] Later, she worked at various music stores, at Peet's Coffee, and as an "in home caregiver."[146] Her last job ended in 2010.[147] The plaintiff "complained of sadness, low self-esteem, anxiety, dissociation, and sleep problems."[148]

On a questionnaire, the plaintiff described her quality of life as being "somewhere between satisfactory and in need of improvement."[149] She had a license, a car, a few friends, and a boyfriend.[150] She felt "uncomfortable with sex and affection" and, with the exception of her father, was estranged from most of her family members.[151]

---

[139] AR 463.

[140] AR 462–64.

[141] AR 464.

[142] *Id.*

[143] *Id.*

[144] AR 463.

[145] *Id.*

[146] *Id.*

[147] AR 462.

[148] AR 462, 464.

[149] AR 464.

[150] *Id.*

[151] AR 462, 464.

Dr. Franklin and Dr. Walser administered a clinical interview and numerous tests.[152] On the day of the evaluation, the plaintiff's mood was depressed, she had a "restricted range of affect," her thought processes were "normal," she did not exhibit any signs of hallucinations, and she "denied suicidal and homicidal ideation."[153] The plaintiff took Celexa (for depression) and Gabapentin (for anxiety).[154] She was "adequately groomed" and had "no overt gross motor slowing."[155] "[H]er fine motor skills were normal except that she exhibited a tremor under pressure in the cognitive testing. . .[and she] became excessively sweaty."[156] The plaintiff could pay "sufficient attention to complete the evaluation" but there were some "gaps in her memory" about parts of her past.[157] She was sufficiently oriented "to person, place, time, and situation" and as the evaluation progressed, she became less anxious and more forthcoming.[158] She seemed "emotionally disengaged from the material she presented."[159] The plaintiff showed "adequate insight into her difficulties" and was able to articulate her coping mechanisms.[160] Her judgment was "fair" and she did not consume "alcohol or drugs on the day of the evaluation."[161]

The Wechsler Abbreviated Scale of Intelligence, Second Edition (WASI-II) measures intelligence functioning.[162] Overall, the plaintiff's intellectual skills were "solid."[163] She exhibited "superior" verbal-comprehension skills, "average" perceptual reasoning, and "average" full-scale

---

[152] AR 462.

[153] AR 465.

[154] AR 464.

[155] AR 465.

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] AR 466.

intelligence.[164] Her IQ was 107, placing her in the "68th percentile in the Average Range."[165] Dr. Walser and Dr. Franklin indicated that "[t]here was moderate variability between index scores" and that the IQ score should "be interpreted with caution."[166]

The Repeatable Battery for the Assessment of Neuropsychological Statues (RBANS)-Form A measures "cognitive functioning in the areas of memory, attention, visuospatial abilities, and language functioning."[167] The plaintiff's scores for immediate memory, language, attention, and delayed memory were average and her visuospatial/constructional score was "far below average."[168] Her overall score was 92, which placed her in the 30th percentile or "average" range.[169]

The Mini Mental State Examination (MMSE) screens for cognitive impairment.[170] The plaintiff's overall MMSE score "was 28/30, placing her in the Intact Functioning range."[171] She successfully followed instructions and could spell words backwards, understand abstractions, repeat phrases back exactly, and recall words upon delay.[172]

The Trail Making A & B screens for executive functioning.[173] The plaintiff was able to connect a series of numbers without error "within normal limits" and could shift from number to letter at an "adequate pace."[174] These results did not suggest "significant problems with executive functioning."[175]

---

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] AR 466–67.

[170] AR 467.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

The Miller Forensic Assessment of Symptoms (M-Fast) measures whether someone is prone to overstating or exaggerating their symptoms.[176] The plaintiff's M-FAST score "indicat[ed] that she [was] in a higher level of distress [depression] then is seen in the general population, but there is a very low probability that she is malingering."[177]

The Beck Depression Inventory, Second Edition (BDI-II) measures depressive symptoms.[178] The plaintiff's BDI scored in the "severe range for depressive symptoms."[179] Her symptoms included sleep disturbance, exhaustion, lack of energy, poor appetite, and no sex drive.[180] She often felt like crying and felt "foggy, dizzy, and unable to think."[181] She could concentrate when necessary.[182] She was indecisive, ignored her problems, felt "sad, guilty, and pessimistic, about her future," "compare[d] herself to others," and fe[lt] "damaged and worthless."[183] "She struggle[d] with anhedonia, but she blame[d] herself for this and [thought] if she tried harder, she would have more fun and so would the other people around her."[184]

The Beck Anxiety Inventory (BAI) measures anxiety.[185] Her score indicated a "severe anxiety disorder[] . . [that] has its roots in her trauma history."[186]

The Posttraumatic Stress Checklist-Civilian Version (PCL-C) measures post-traumatic stress in the civilian population.[187] Her score indicated civilian PTSD.[188] "[S]he [had] recurrent intrusive

---

[176] Id.

[177] Id.

[178] Id.

[179] Id.

[180] AR 468.

[181] Id.

[182] Id.

[183] Id.

[184] Id.

[185] Id.

[186] Id.

[187] Id.

[188] Id.

memories and dreams about the past," "experience[d] some physiological reactivity to even mild triggers, and [got] dizzy, tremulous, wobbly, and excessively sweaty."[189] "Her triggers [were] not just sexual. When someone put[] pressure on her, she [could] be triggered into a state of panic."[190] As a result, she isolated herself, avoided being in situations "where she experience[d] pressure," and performed better in one-on-one interactions.[191] The plaintiff worked on her PTSD in individual therapy (she found group therapy "threatening") because she "ha[d] enough insight to know that avoiding treatment ma[de] her worse."[192] She found "emotional work slow and painful" and often dissociated during her sessions.[193] "She [believed] she disassociated a lot in her late twenties and thirties" and continued to disassociate as she aged.[194] The plaintiff struggled to develop "normal relationships with men.[195] The plaintiff was "not psychotic, and there was no evidence presented that there have been episodes of mania. [The plaintiff] reported a history of being visited by spirits, but in the context of her family and Native American culture, these experiences were not interpreted as delusional. Her situation [was] no longer complicated by substance abuse."[196]

Dr. Franklin diagnosed the plaintiff with PTSD with "[d]epersonalization and [d]erealization," moderate major depressive disorder, alcohol use disorder (in remission), partner relational problems, occupational problems, housing problems, and low income.[197] The plaintiff was competent, "emotionally disconnected from her experiences," and suffered from "hypervigilance, fear, sadness, and dissociation in her adulthood."[198] She scored in the "severe" range for

---

[189] Id.

[190] Id.

[191] Id.

[192] Id.

[193] Id.

[194] Id.

[195] AR 469.

[196] Id.

[197] Id.

[198] Id.

depression and anxiety and presented with PTSD symptoms.[199] The plaintiff had "poor" self-esteem, "average intelligence," "mostly adequate neurocognitive skills," "mild cognitive slowing," and a lower performance on visuospatial constructional tasks "then would be expected given her other skills and abilities."[200] The plaintiff could "manage her money appropriately," and her alcohol abuse issues appeared to be under control, meaning she would not require a payee if awarded SSI.[201]

Regarding the plaintiff's functional abilities in the workplace, Dr. Franklin found the following:

> [The plaintiff] has been able to live independently and work in the past, but she has not worked in a full time job since 2006. Based on the testing results, it is likely that [the plaintiff] would have no difficulty remembering and following sample instructions while at work and she would likely have mild trouble remembering and following complex directions. Her ability to pay attention is good on formal measures, but in an emotionally laden situation, she could have moderate difficulties. Her ability to perform tasks at a reasonable pace would be mildly impaired. Her ability to get along with the public and coworkers would be moderately impaired due to her anxiety and inhibitions, and her ability to accept criticism and redirection form supervisors would likely be moderately impaired. Her ability to get to work and follow a schedule has been very poor in recent years. Her work at Peet's ended due to conflicts over attendance, and she left her last informal job because she could not manage the schedule. [The plaintiff] isolates when under stress, therefore her work would be markedly impacted by her mental health situation. Her mental health symptoms could markedly interfere with appropriate work functioning if she were to overcome her anxiety and find work. In the face of normal work stressors, [the plaintiff] could dissociate or simply leave in order to manage any uncomfortable feelings that might arise. This situation has lasted for the last 8 years, and even with intensive treatment, it is likely she will continue to have significant difficulties in the future.[202]

The plaintiff showed mild difficulties "[u]nderstand[ing], remember[ing], and carry[ing] out detailed instructions" and "perform[ing] at a consistent pace without an unreasonable number and

---

[199] Id.

[200] Id.

[201] AR 470.

[202] Id.

length of rest periods."[203] She showed moderate difficulties "maintain[ing] attention and concentration for two-hour segments," "get[ting] along and work[ing] with others," "interact[ing] appropriately with the general public," "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors."[204] She showed marked difficulties "respond[ing] appropriately to changes in a routine work setting and deal[ing] with normal work stressors," "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms," "maintain[ing] regular attendance," and "be[ing] punctual within customary, usually strict tolerances."[205]

On July 10, 2014, Dr. Franklin filed out a "Mental Impairment Questionnaire."[206] She diagnosed the plaintiff with "maj depression," PTSD, "alcohol use, sustained remission," and difficulties in aspects of her life including "social, occupational, housing, economic."[207] The plaintiff suffered from the following symptoms: "[a]nhedonia or pervasive loss of interest in almost all activities," "[a]ppetite disturbance with weight change," "[d]ecreased energy," flat affect, "[f]eelings of guilt or worthlessness," [g]eneralized persistent anxiety," "[m]ood disturbance," "[r]ecurrent and intrusive recollections of a traumatic experience, which [we]re a source of marked distress," "[p]ersistent disturbances of mood or affect," "[a]pprehensive expectation," "[e]motional withdrawal or isolation," "[v]igilance and scanning," and "[s]leep disturbance."[208] Gabapentin, "[could] have implications for working" because side effects include dizziness and fatigue.[209] The plaintiff's MMSE score (28/30) reflected a "mild impairment[;] however[,] this d[id] not take into account social difficulties presented by [the] client."[210] The

---

[203] AR 471.

[204] Id.

[205] Id.

[206] AR 472.

[207] Id.

[208] Id.

[209] Id.

[210] AR 473.

plaintiff was not a "malingerer," her impairments were not caused by substance abuse, she did not have a low IQ, and her mental condition did not exacerbate her "experience of pain or any other physical symptom."[211]

The plaintiff had a number of impairments that impacted her ability to do *work-related activities on a day-to-day basis in a regular work setting*" and Dr. Franklin estimated that the plaintiff's impairments would make her absent from work "more than four days per month."[212] The plaintiff exhibited mild impairments carrying out simple instructions and being cognizant of "normal [work] hazards and tak[ing] appropriate precautions."[213] She exhibited moderate impairments maintaining attention for two hours, sustaining an "ordinary routine without special supervision," working in close proximity to others "without being unduly distracted," making "simple work related decisions," performing "at a consistent pace without an unreasonable number and length of rest periods," asking basic questions or asking for help, "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors," and getting along with co-workers without "unduly distracting them or exhibiting behavioral extremes."[214] She exhibited marked difficulties attending work regularly and being punctual "within customary, usually strict tolerances" and finishing a normal workday/workweek "without interruptions from psychologically based symptoms."[215] She exhibited extreme difficulties coping with "normal work stress."[216]

The plaintiff had a mild impairment "carry[ing] out detailed instructions" and marked impairments "set[ting] realistic goals or mak[ing] plans independently of others" and coping with work stress.[217]

---

[211] AR 472.

[212] AR 472, 474 (emphasis in the original).

[213] AR 474.

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] AR 475.

She had moderate impairments interacting "appropriately with the general public," maintaining "social[ly] appropriate behavior," travelling in unfamiliar places, and using public transportation.[218]

Dr. Franklin concluded that the plaintiff had moderate deficiency in "concentration, persistence[,] or pace" and marked difficulty in maintaining her social functioning.[219] Dr. Franklin did not identify any episodes of decompensation.[220]

On September 29, 2016, Dr. Franklin supervised a psychological evaluation of the plaintiff conducted by Dionne Childs, MS."[221]

Regarding her occupational history, the plaintiff said:

> [S]he tend[ed] to get fired from office positions because she [was] 'not good at desk jobs.' She reported that she last worked at the end of 2014 in a day program for developmentally delayed adults and dealt with difficult and violent clients there. She stated she did well at this job, but "lateness and paperwork" became a problem and at the time she had recently begun the alcohol recovery process. She indicated that persistent obstacles to obtaining and maintaining gainful employment are related to the fact that she experiences periods where she progressively zones out while completing job tasks and then progressively returns to a state where she is able to resume the task.[222]

In addition to a clinical interview, Dr. Franklin and Ms. Child administered the M-FAST, MMSE, RBANS, and Trail Making A & B tests.[223] Throughout the evaluation, the plaintiff had a pleasant disposition and was engaged and open about her experiences.[224] She was oriented to "person, place and time," her attention was normal, she "worked at a rate that was adequate as compared with peers," and she was able to sustain attention well enough to remember short strings

---

[218] AR 475.

[219] *Id.*

[220] AR 475–76.

[221] AR 546.

[222] AR 547.

[223] AR 546.

[224] AR 548.

of information."[225] She exhibited delayed and immediate memory.[226] Her speech was normal, her affect was appropriate, her mood was anxious, and her insight and judgment were both fair.[227] "Her fund of knowledge, intelligence and abstraction appear[ed] to be within the average range" and she "was able to converse in a manner that was suitable for the evaluator to collect [the necessary] information."[228] Dr. Franklin wrote that the results of the assessment were a "valid representation of [the plaintiff's] psychological and cognitive functioning."[229]

The plaintiff scored 100 on the RBANS Language index, which was in the 50th percentile.[230] On the RBANS Visuospatial/Constructional index, she scored 81, which placed her in the 10th percentile, "Low Average range."[231] She scored an 87 on the RBANS Immediate Memory index, placing her in the 19th percentile, "Low Average range."[232] On the RBANS Delayed Memory index, she scored an 83, which placed her in the 13th percentile.[233] She scored a 106 on the RBANS Attention index, placing her in the 66th percentile, average range.[234]

The plaintiff said that "experience[d] frequent and unpredictable periods of dissociation coupled with the ability to function within average range on attention measures when outside of this dissociative state."[235] The plaintiff showed "impaired performance on measures of executive functioning, which involves the cognitive ability to preview, plan, sequence, and modify actions."[236] Her Trails A performance was within normal limits and her Trails B performance was

---

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] AR 549.

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id.*

[234] AR 550.

[235] *Id.*

[236] *Id.*

impaired.[237] "On the MMSE, [the plaintiff] was unable to count backward by sevens. She was able to spell the word 'world' backward."[238] Her overall MMSE score was 29/30, "suggesting no impairment."[239] Her overall cognitive assessment score was in the 16th percentile low average range.[240]

The plaintiff scored a 2 on M-FAST, showing that she "was not prone to overstate the severity of her symptoms. . . . she was generally telling the truth and putting forth adequate effort."[241] The plaintiff reported experiencing the following symptoms:

> [D]epressive symptoms that included: depressed mood, loss of interest, sleep disturbance, psychomotor retardation, fatigue, feelings of worthlessness/guilt, poor concentration, and suicidality. She endorsed additional symptoms related to Posttraumatic Stress Disorder: a traumatic event where death or serious injury was intensely feared; reexperiencing of the event; avoidance of associated stimuli, reduced interest in participating in activities, feeling detached or estranged, and a sense of foreshortened future; and increased arousal or angry outbursts, hypervigilance, and exaggerated startle response. Additionally[,] she reported extreme difficulty with focus and attention to the point that multiple times per day she experiences periods of dissociating and zoning out and then returning to previous functioning. Dissociation is often seen as a response to emotional trauma.[242]

The plaintiff "[wa]s a hermit" and was generally "'leery of people.'"[243]

Dr. Franklin diagnosed the plaintiff with major depressive disorder, PTSD, unspecified dissociative disorder, relational problems, occupational problems, and low income.[244] "Global Assessment of Functioning would describe [the plaintiff] as having serious impairment in social and occupational functioning."[245] Regarding her employment in particular, Dr. Franklin wrote:

---

[237] Id.

[238] Id.

[239] Id.

[240] Id.

[241] Id.

[242] AR 551.

[243] Id.

[244] Id.

[245] Id.

"the frequent and unpredictable nature of her dissociative states is quite problematic despite a snapshot of attention scores that suggest otherwise average functioning."[246] "[S]he has had difficulty maintaining and obtaining employment. She has had difficulty remembering and following instructions, low frustration tolerance, and trouble consistently complying with strict workplace expectations."[247] He noted that there was "no evidence of substance use on the day of the evaluation and no evidence that she was exaggerating her symptoms for personal gain."[248] Regarding "Mental Abilities and Aptitudes Needed To Do Unskilled Work," the plaintiff showed mild impairments getting along with others and working with others, interacting appropriately with others, "accept[ing] instructions[,] and respond[ing] appropriately to criticism from supervisors."[249] She showed marked impairments understanding, recalling, and following simple instructions and "respond[ing] appropriately to changes in a routine work setting and deal[ing] with normal work stressors."[250] She showed extreme impairments understanding, recalling, and following detailed instructions, maintaining concentration for more than two hours, "perform[ing] at a consistent pace without an unreasonable number and length of rest periods," "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms," and regularly attending work and being punctual within "customary, usually strict tolerances."[251]

### 2.1.6    Pathways to Wellness – Treating

On October 23, 2014, the plaintiff had an "Initial Assessment" at Pathways to Wellness.[252] The plaintiff said her medications did not work.[253] The plaintiff worked at a "development facility for

---

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] AR 553.

[250] *Id.*

[251] *Id.*

[252] AR 537. The physician's signature is illegible.

[253] *Id.*

[developmentally disabled] adults" and wanted to "achieve more in her life."[254] Her mood was

depressed, her affect was "appropriate and engaged, cooperative," her thought process was linear,

and her abstract reasoning was good.[255] She did not have delusions, hallucinations, or

obsessions.[256] She had depression, feelings of worthlessness and guilt, crying spells, and

anxiety.[257] She had "difficulties in education/employment/day/social activities" and a "history of

recurring substantial functional impairments."[258] Her psychiatric history demonstrated that

"without mental health service there is a high risk of recurrence to a level functional

impairment."[259] She took Celexa and Gabapentin.[260] The plaintiff had moderate limitations in

"maintaining concentration, persistence of place," marked limitations in "[r]estriction of activities

of daily living" and "difficulties maintaining social functioning/relationships," and extreme

episodes of decompensation and increased symptoms of extended duration.[261] The attending

psychiatrist decreased her Celexa dosage, started her on Lexapro, continued her on Gabapentin,

and diagnosed her with "recurrent psychosis" and "recurring ETOH."[262] The plaintiff had a GAF

of 65.[263]

    Ruth Nunez, MA, MFT filled out the plaintiff's "Client Plan" for Pathways to Wellness.[264] She

diagnosed the plaintiff with Major Depressive Disorder ("MDD"), Posttraumatic Stress Disorder

("PTSD'), Alcohol Use Disorder ("ETOH use DO"), "h/0 abuse" and moderate social and

---

[254] AR 537, 541.

[255] AR 540.

[256] *Id.*

[257] AR 542.

[258] *Id.*

[259] *Id.*

[260] AR 538.

[261] AR 541.

[262] AR 542.

[263] AR 541.

[264] AR 532.

economic issues.[265] Her social issues stemmed from her "ongoing issues with mixed moods," which led to "interpersonal conflicts and struggles to maintain social connections."[266] The plaintiff's economic problems stemmed from her unemployment and limited source of income.[267] Her strengths included being "resilient, resourceful, responsible" and having "articulate needs."[268] She had symptoms "7 days/week with severe intensity."[269] Pathways anticipated transitioning the plaintiff to a lower level of care roughly "6 months after [the] onset of treatment."[270]

On November 12, 2014, the plaintiff saw Michael [unreadable]. The plaintiff's Lexapro trial made her feel "horrible."[271] They put her on a new medication [unreadable].[272] Her symptoms included "crying, low self[-]esteem, [and] feel[ing] worthless."[273]

In November [unreadable] 2014, the plaintiff appeared healthy, adequately groomed, cooperative, and calm and she spoke normally, and was in an anxious mood.[274] Her affect was constricted, her thought process was linear, and her memory was intact.[275] Her attention/concentration was "good," her judgment and insight were "fair," and she did not appear to pose a danger to herself or others.[276] [Most of this report is unreadable.]

On December 12, 2014, the plaintiff felt "shitty" and was attending all of her AA meetings.[277] She had side effects, including anxiety and insomnia, from her Abilify medication.[278] The

---

[265] AR 530.

[266] Id.

[267] Id.

[268] Id.

[269] Id.

[270] AR 531.

[271] AR 528.

[272] AR 529.

[273] AR 536.

[274] AR 526.

[275] AR 527.

[276] Id.

[277] AR 524.

[278] Id.

plaintiff's complaints were categorized as "attention getting," and she was prescribed a new medication, Celexa.[279]

On December 30, 2014, t the plaintiff was generally "okay."[280] Her depression had decreased since switching to a new medication.[281] She denied anxiety, mania, and suicidal or homicidal ideation, was sleeping "okay," and had low energy and a low appetite.[282] She attended therapy, exercised, and had a support system via AA and her sober friends.[283]

On January 27, 2015, the plaintiff saw Seamus McCoy, N.P., for a medication follow-up.[284] "[Her] moods 'evened out,' sadness continue[d], irritability decreased, sleep adequate, energy low, appetite normal, libido low, concentration poor, 'zone[d] out' sometimes – has occurred as long as 20 yrs ago, 'racing thought[s],' worrying, negative thoughts, anxiety (decreased w gabapentin), no nightmares or flashbacks, feelings of guilt, denie[d] SI/HI."[285] She lost her job two months prior to this appointment and subsequently began receiving unemployment income.[286] She was continuing therapy, AA, and CODA.[287] The plaintiff appeared adequately groomed, cooperative, and calm, and she spoke normally and was in a sad mood.[288] Her affect was sad, her thought process was linear, her thought content was within normal limits, and her memory was intact.[289] Her judgment, attention/concentration, and insight were "fair" and she did not appear to pose a danger to herself or others.[290] The plaintiff failed trials with Lexapro, Abilify, and Remeron and had bad reactions

---

[279] AR 525. The rest of the text surrounding this is unreadable so the context is unclear.

[280] AR 522.

[281] *Id.*

[282] *Id.*

[283] *Id.*

[284] AR 520.

[285] *Id.*

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] AR 521.

[290] *Id.*

to Wellbutrin.[291] Nurse McCoy started her on Lamictal (25 mg) and encouraged her to work out three times a week rather than once a week.[292] The plaintiff's risk of decompensation was high because of her "recent unemployment and trauma work in groups and 1:1 therapy."[293]

On February 24, 2015, the plaintiff saw Nurse McCoy for another medication follow-up.[294] The plaintiff had "racing thoughts [that] continue[d] all day long, d[id] not prevent [the plaintiff] from falling asleep, concentration remain[ed] poor, mood improved, energy improved 'good,' anxiety 'comes and goes' same as last visit, continue[d] w absence of nightmares or flashbacks (last was about 2 months ago), possible dissociation, denie[d] SI/HI."[295] The plaintiff thought that her Lamictal prescription might be causing some side effects including "upset[ting] her balance . . . [and] mak[ing] racing thoughts worse."[296] She attended therapy (which was "helpful") and AA and CODA meetings.[297] She received unemployment income.[298] She drank five cups of coffee per day, and she smoked eight cigarettes per day.[299] The plaintiff was adequately groomed, cooperative, and calm, and she spoke normally and was in a sad and anxious mood.[300] Nurse McCoy decreased her Lamictal dosage and recommended that she decrease her coffee consumption from five to four cups per day and exercise five times a week.[301]

On March 3, 2015, the plaintiff reported having flashbacks, feeling hypervigilant, and experiencing moderate anxiety, feelings of PTSD and avoidance, poor concentration, racing thoughts, irritability, "sleep onset [at] 4:30 or 5am," a depressed mood, low energy, and "passive

---

[291] Id.

[292] Id.

[293] Id.

[294] AR 518.

[295] Id.

[296] Id.

[297] Id.

[298] Id.

[299] Id.

[300] Id.

[301] AR 518-19.

[suicidal ideation] – no plan or intent."[302] She was healthy looking, was cooperative and calm, spoke normally, and was in an apathetic mood.[303] Nurse McCoy prescribed Effexor.[304] He wanted to taper the plaintiff off of Citalopram, continue Gabapentin, decrease her caffeine consumption, and "consider adding new med for sleep onset."[305]

On April 28, 2015, the plaintiff saw Marina Obolnikov, M.D. The plaintiff drank roughly four cups of coffee a day and smoked eight cigarettes a day.[306] The plaintiff appeared healthy, adequately groomed, cooperative, and calm, spoke normally, and was in a sad mood, though her degree of sadness was "close to average."[307] The plaintiff was in the process of "tapering off Celexa and starting Effexor XR."[308] She was doing well on her medications and indicated "no disorientation . . . no psychosis, no racing thoughts, [and] no safety risk."[309]

On May 26, 2015, the plaintiff reported that she had adequate sleep, had energy, low concentration, and "thoughts about past trauma daily or every other day."[310] She felt less depressed and anxious.[311] Her therapist was not helpful, and she was looking for a new one.[312] Nurse McCoy increased her Effexor prescription and decreased her Celexa dosage.[313] The plaintiff's MDD symptoms decreased "significantly," and her PTSD symptoms decreased

---

[302] AR 516.

[303] *Id.*

[304] AR 517.

[305] *Id.*

[306] AR 514.

[307] *Id.*

[308] AR 515.

[309] *Id.*

[310] AR 512.

[311] *Id.*

[312] *Id.*

[313] AR 513.

"somewhat" with medications.[314] Her feelings of sadness and anxiety still persisted but were "decreased."[315]

On July 7, 2015, the plaintiff had a "depressed mood, low energy, poor concentration, nightmares, flashbacks, anxiety, feelings of guilt."[316]

On July 7, 2015, during another medication follow-up with Nurse McCoy, the plaintiff was sleeping "okay," felt less depressed, had low energy, a normal appetite, poor concentration, and fewer nightmares, and felt anxious, and her flashbacks "decreased to approx. once per week."[317] She felt "'spacey.'"[318] Nurse McCoy reported that this may be a side effect of her medications.[319] The plaintiff's symptoms of "MDD and STPD decreased with current medication."[320] Nurse McCoy increased her Effexor dosage and decreased her Celexa dosage.[321] Overall, he indicated a "fair" prognosis.[322]

On August 4, 2015, the plaintiff felt "somewhat sedated w increased Effexor, [her] anxiety remain[ed] moderate, decreased depression, [and] concentration moderate."[323] She felt "slightly more 'spacey,'" and her "flashbacks decreased to less than 1x per week."[324] The plaintiff's MDD and PTSD symptoms were "mildly improved" with her recent Effexor dosage increase.[325] Nurse

---

[314] *Id.*

[315] *Id.*

[316] AR 535.

[317] AR 510.

[318] *Id.*

[319] *Id.*

[320] AR 511.

[321] *Id.*

[322] *Id.*

[323] AR 508.

[324] *Id.*

[325] AR 509.

McCoy did not change her medications but recommended that the plaintiff decrease her caffeine intake "due to excess anxiety."[326]

On September 29, 2015, the plaintiff's symptoms included "nightmares, flashbacks, hypervigilance, avoidance, racing thoughts, feel[ing] more 'spacey and less present', depression, crying spells, guilt, feelings of worthlessness, low energy, poor concentration, anxiety, irritability, [and] passive SI-no plan or intent."[327] The plaintiff's updated treatment plan included using monthly medication management to reduce occurrences of these symptoms by 50% "within the next 12 months."[328]

On September 29, 2015, the plaintiff had interrupted sleep, low energy, and improved anxiety.[329] Her "spacey" feeling was getting worse, she experienced flashbacks once a week, and she did not have any nightmares.[330] She mentioned a job but did not elaborate about it.[331] She met with a sponsor once a month, went to therapy, and exercised..[332] She had medication side effects including "forgetfulness [and] low energy."[333] Nurse McCoy decreased the plaintiff's Effexor dosage.[334] He did not alter her Gabapentin dosage because she noted that her "'memory issue [was] not that bad.'"[335] Her MDD and PTSD symptoms decreased.[336]

On November 24, 2015, the plaintiff was sleeping "okay" and had continual flashbacks "once per week," and Effexor alleviated some of the "spacey feeling[s]." [337] She was looking for a new

---

[326] *Id.*

[327] AR 534.

[328] *Id.*

[329] AR 505.

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] *Id.*

[334] AR 507.

[335] *Id.*

[336] *Id.*

[337] AR 504.

therapist.[338] Nurse McCoy noted that on her current medication, the plaintiff's MDD and PTSD symptoms were "low" and did not alter her medications.[339]

On January 21, 2016, the plaintiff had low energy, moderate anxiety, and flashbacks, though she had not had one "in a while."[340] Her MDD and PTSD symptoms were "currently low."[341] She declined changes to her medication and noted that the side effects of "higher dose Effexor [were] intolerable."[342] Nurse McCoy's prognosis was that the plaintiff was doing "fair."[343] He continued her Gabapentin prescription, increased her Effexor dosage, and encouraged her to continue her weekly therapy sessions.[344]

On February 19, 2016, the plaintiff saw Nurse McCoy for an updated "Treatment Plan which involved "reduc[ing] her depression and anxiety by 10% in [the] next six months."[345]

On April 7, 2016, the plaintiff reported that she was a part-time dog worker and described her alleviating factors as "meds, therapy, AA 3/7, sponsor."[346] The plaintiff had "poor control of symptoms and affective flattening with current meds" and was thinking about "coming down on the Effexor."[347] Nurse Collins instructed her to taper off of Venlafaxine and start Paroxetine.[348]

---

[338] *Id.*

[339] AR 506.

[340] AR 502.

[341] *Id.*

[342] *Id.*

[343] *Id.*

[344] *Id.*

[345] AR 533.

[346] AR 500.

[347] AR 500–01.

[348] AR 501.

On May 6, 2016, the plaintiff saw Hiawatha Harris, M.D., for a prescription refill and evaluation.[349] The plaintiff's response to medication was "adequate."[350] Dr. Harris's overall prognosis was that the plaintiff was doing "fair."[351]

On June 8, 2016, the plaintiff felt tired, stressed, and depressed and was "triggered by [her] ACA [adult children of alcoholics] group."[352] Her mood was "stable, [with] moderate depression and high anxiety" and she suffered from flashbacks on a weekly basis.[353] The plaintiff gained weight and had "poor concentration," and her appetite/energy was "high/low."[354] She identified "therapy, meds, sponsor, [and her] adult children of alcoholics group" as alleviating factors.[355] The plaintiff stopped taking Gabapentin because her therapist told her Gabapentin was only prescribed as-needed.[356] Nurse Collins recommended that the plaintiff try Buproprion instead.[357] The plaintiff's PTSD and depression were "not controlled by meds and therapy."[358]

On June 21, 2016, the plaintiff was on Gabapentin and felt "fair" but had a discussion with Nurse Collins about potential options for treating agitation and anxiety by either increasing her Gabapentin dosage or trying a medication called Desvenlafaxine.[359] The plaintiff had "mild symptoms."[360]

---

[349] AR 498.

[350] Id.

[351] AR 499.

[352] AR 496.

[353] Id.

[354] Id.

[355] Id.

[356] Id.

[357] AR 496–97.

[358] AR 497.

[359] AR 494.

[360] AR 495.

On July 27, 2016, the plaintiff was taking Pristique "without clear benefit" and Gabapentin.[361] Her mood was stable and "euthymic," and she showed signs of depression and anxiety.[362] Nurse Collins increased the plaintiff's dosages of Pristique and Gabapentin and noted that the plaintiff "demonstrate[d] insight that meds will only do so much and that she would benefit from continued therapy."[363]

### 2.1.7     Alameda County Social Services Agency — Examining

On January 17, 2013, Martha Helms, MFT, examined the plaintiff for "mental health conditions that may prevent [her] from being able to work."[364] The plaintiff's work limitations stemmed from her chronic depressive disorder, her PTSD, her "long-term alcohol abuse," and her "low tolerance for stress."[365] She had "not significant" limitations carrying out simple instructions, completing a normal workday/work-week, getting along with coworkers "without unduly distracting them or exhibiting behavioral extremes," and being aware of workplace hazards and taking appropriate precautions against them.[366] She had moderate limitations in understanding and memory, maintaining attention for more than two hours at a time, maintaining an ordinary routine without special supervision, asking basic questions and asking for assistance, and responding appropriately to changes in a routine work setting.[367] She had marked limitations in regularly attending work and being punctual within customary tolerances, completing a normal workday and work-week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors.[368] The plaintiff could not

---

[361] AR 492.

[362] *Id.*

[363] AR 492–93.

[364] AR 544.

[365] AR 545.

[366] AR 544.

[367] *Id.*

[368] *Id.*

work for one year and had work restrictions related to her "lower tolerance for stress: 10 year pattern of coping with stress, emotional pain with alcohol use," and the plaintiff's recovery from alcohol abuse was recent, which made her "vulnerable to relapse."[369]

### 2.1.8    Cheryl Cranshaw LMFT — Treating

Ms. Cranshaw started treating the plaintiff in December 2015.[370] At the time of her meetings with Ms. Cranshaw, the plaintiff was unemployed and was four years' sober.[371] The plaintiff was "oppositional, depressed, anxious and chronically lethargic." [372] She struggled to concentrate and dissociated daily.[373] She experienced unpredictable mood swings, quickly going from cooperative to "oppositional and argumentative," with "bouts of intense, inappropriate anger," and hypersomnia, where she could not get out of bed.[374] Her hypersomnia led to fights with her father and she was "on the verge of homelessness."[375] The plaintiff experienced "frequent and terrifying" episodes of "intense psychological reactivity, [and] increased heart rate."[376] At times, she felt like she was dying.[377] "Because these episodes c[ould] be daily, intense and unpredictable, she [was] fearful of going into public spaces suggesting agoraphobic features."[378] "She ha[d] no friends or close relationships."[379]

---

[369] AR 545.

[370] AR 554.

[371] Id.

[372] Id.

[373] Id.

[374] Id.

[375] Id.

[376] Id.

[377] Id.

[378] Id.

[379] Id.

The plaintiff recalled an incident when she sought out her mother's attention as a toddler, and her mother "responded with a kick."[380] Her mother told her that she never wanted any children.[381] Though the plaintiff's father knew she was being physically and emotionally abused as a child, he never protected her from it.[382] She was bullied and abused at school because of her physical appearance.[383] Her alcohol, depression, and anxiety problems developed while she was providing hospice care for her mother as a teenager.[384] She resented her father for leaving her to care for her dying mother.[385] "She [could not] recount a time when she was happy and not depressed, nor a time when she had any meaningful relationships."[386] Her medication "d[id] not sufficiently control her symptoms."[387]

Regarding the plaintiff's employment history, Ms. Crenshaw found:

> Despite her desire to work[,] she was unsuccessful . . . . In two situations, dissociation was a problem[.] [S]he was reprimanded for "staring into space" rather than working. She was eventually terminated because of her inability to focus. She was terminated from the second job because she was late. However, in this instance her tardiness was also related to dissociation. On several occasions, while she was preparing for work she would dissociate causing her to arrive late for work. During the termination discussion, she did not relate to her employer that she frequently dissociates because she was embarrassed.

> In [a] third attempt at employment[,] she was let go after she argued with her supervisor who told her that her attitude was not right for the job.[388]

The plaintiff never had "successful or [sus]tained employment" and "felt heavily criticized because of her inability to maintain attention and concentration."[389] She failed to remember

---

[380] AR 555.

[381] *Id.*

[382] *Id.*

[383] *Id.*

[384] *Id.*

[385] *Id.*

[386] AR 556.

[387] AR 555.

[388] AR 556.

[389] *Id.*

instructions or carry out work tasks and argued with her supervisors."[390] "She ha[d] poor insight and d[id] not recognize her inability to accept supervision from her superiors as a symptom of mental illness. She [was] defensive and sensitive to the slightest correction. She [was] unable to interact appropriately with her superiors."[391]

The plaintiff was anxious and tense, her "thought[,] mood[,] and affect [were] depressed and irritable," her speech was monotone, and her judgment and insight were poor.[392] "She [could] become inappropriately argumentative, when she fe[lt] that her requests may not be met."[393] She had suicidal and homicidal ideation "with no plan."[394] The plaintiff's "pattern of instability in interpersonal relationships, impulsivity, intense episodic dysphoria, chronic feelings of emptiness, and dissociative symptoms, all point[ed] to a diagnosis of Borderline Personality Disorder."[395] She had "long-term or chronic traits that are likely to have persisted for several years prior to this assessment."[396]

The plaintiff ranked in the severe range on the Beck Depression and Anxiety Inventory.[397] She was "chronically depressed," had a GAF score of 51, and had "impaired reality testing and major impairments in social, psychological[,] and occupational functioning."[398] The plaintiff's symptoms contributed to her "past failures." [399] Those failures "reinforce[d] her feelings of worthlessness, [and made] her hopeless, [and] unable to strategize, develop, or pursue employment goals and aspirations."[400] The plaintiff's "lack of insight; inability to conform behavior to the workplace,

---

[390] *Id.*

[391] *Id.*

[392] *Id.*

[393] *Id.*

[394] *Id.*

[395] *Id.*

[396] AR 556–57.

[397] AR 557.

[398] *Id.*

[399] *Id.*

[400] *Id.*

oppositional behavior and dissociation ha[ve] interfered with her ability to work."[401] Ms. Cranshaw concluded that the plaintiff's condition warranted "a careful plan of action including on-going psychiatric visits and medication management, weekly psychotherapy[,] and support groups."[402] She recommended Assertive Community Treatment, which provided "community based psychiatric treatment, rehabilitation[,] and support[,] especially around housing and employment," and Reinforcement and Modeling Techniques meant to minimize the plaintiff's symptoms of "dissociation, social isolation, irritability[,] and oppositional behavior."[403]

### 2.1.9    Eugenie Arnold, MFT, Psy.D. — Treating

Dr. Arnold saw the plaintiff once a week from September 26, 2016 to November 16, 2016.[404] Dr. Arnold filled out a "Mental Impairment Questionnaire."[405] She diagnosed the plaintiff with recurrent major depressive disorder, generalized anxiety disorder, avoidant personality disorder, and dissociative disorder and concluded that these conditions were likely to last more than twelve months.[406] The plaintiff took Pristiq, Gabapentin, and Benadryl.[407] The plaintiff was not a malingerer, could manage her finances in her own best interest, did not have a low IQ, and did not have any physical symptoms.[408]

The plaintiff's symptoms included "appetite disturbance with weight change," decreased energy, "feelings of guilt or worthlessness," generalized persistent anxiety, mood disturbance, "difficulty thinking or concentrating," "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress," "persistent disturbances of mood or affect," personality changes, apprehensive expectation, "paranoid thinking or inappropriate

---

[401] *Id.*

[402] *Id.*

[403] *Id.*

[404] AR 558.

[405] AR 558–561.

[406] AR 558.

[407] *Id.*

[408] *Id.*

suspiciousness," "recurrent obsessions or compulsions[,] which are a source of marked distress," "emotional withdrawal or isolation," "persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation," "intense and unstable interpersonal relationships and impulsive and damaging behavior," disorientation regarding time and place, "perceptual or thinking disturbances," motor tension, easy distractibility, short-term memory impairment, and sleep disturbance.[409] Dr. Arnold put a question mark next to "[l]oss of intellectual ability of 15 IQ points or more."[410]

The plaintiff's impairments had a mild effect on work-related mental activities such as making simple decisions, sustaining an ordinary routine without special supervision, accepting instructions and responding appropriately to criticism from supervisors, working with or near others without being unduly distracted or distracting them, "interacting appropriately with coworkers and the general public, responding appropriately to changes in a routine work setting, and adhering to basic standards of neatness and cleanliness."[411] Her impairments had a moderate effect on her ability to understand, remember, and carry out simple instructions, a marked effect on her ability to maintain attention for two-hour segments, perform at a constant pace without an unreasonable number and length of rest periods, and deal with normal work stress, and an extreme effect on her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. [412] The plaintiff had moderate difficulties in maintaining social functioning, and "repeated episodes of decompensation within [a] 12-month period, each of at least two weeks duration," and extreme "deficiencies of concentration, [and] persistence or pace."[413]

---

[409] AR 559.

[410] Id.

[411] AR 560.

[412] Id.

[413] AR 561.

### 2.1.10 Disability Determination Explanations — Non-Examining

Barbara Moura, Psy.D., and Brady Dalton, Psy.D., conducted disability-determination explanations ("DDEs") during the administrative process.[414] One addressed the plaintiff's initial claim for disability, and the second addressed her claim on reconsideration.[415] In both DDEs, the non-examining physicians found that the plaintiff was not disabled.[416]

Barbara Moura, Psy.D., reviewed the plaintiff's medical records and determined that her impairments were not severe individually or in combination.[417] Dr. Moura described the plaintiff's symptoms as "mostly stable now that [she is] one year sober and compliant w/ [treatment] ([medications] and AA)" and said that although the plaintiff may continue to experience residual symptoms, they "do not appear more than mild in severity."[418] Dr. Moura found that the plaintiff had mild "restrictions in activities of daily living," "difficulties maintaining social functioning," and "difficulties in maintain concentration, persistence or pace."[419] The plaintiff did not have any repeated episodes of decompensation of extended duration.[420] Dr. Moura concluded that "if [the plaintiff] continues sober, 12.04 [her affective disorders] and 12.06 [her anxiety] are nonsevere" and her impairments would not "significantly limit [the plaintiff's] physical or mental ability to do basic work activities.[421] Dr. Moura found that the plaintiff's medically determinable impairments could reasonably be expected to produce the plaintiff's symptoms but that the plaintiff's statements about the "intensity, persistence, and functionally limiting effects of the symptoms"

---

[414] AR 129–151.

[415] *Id.*

[416] AR 137; AR 151.

[417] AR 135.

[418] AR 132.

[419] AR 136.

[420] *Id.*

[421] AR 132; 135–36.

were not substantiated by the medical evidence.[422] She described the plaintiff's statements as "[p]artially [c]redible."[423] She concluded that the plaintiff was not disabled.[424]

On reconsideration, the plaintiff alleged that her condition changed, in that she could not concentrate, got easily distracted, and felt that people were judging her.[425] On July 29, 2014, Brady Dalton, Psy. D. reviewed the plaintiff's records and affirmed the initial determination that the plaintiff was not disabled.[426] Because the plaintiff did not attend additional psychological visits as scheduled, Dr. Dalton did not have updated insights into the plaintiff's mental capacity, which precluded an assessment of her claim of worsening symptoms on reconsideration.[427] He found that Dr. Franklin's December 13 opinion "reflect[ed] no significant cognitive impairments" despite Dr. Franklin's findings of "marked impairments in all functional domains."[428] He found the plaintiff's statements about her symptoms "[p]artially [c]redible."[429]

## 2.2 Non-Medical Evidence

### 2.2.1 Function Report

The plaintiff completed a Function Report in conjunction with her application for disability benefits.[430] The plaintiff had difficulty concentrating for long periods, got distracted by her thoughts, felt that others were judging her (which made her "very anxious"), and was triggered when a "current event remind[ed] [her] of an unpleasant past event."[431] Her depression, PTSD, and anxiety impacted her memory, ability to complete tasks, concentration, and ability to follow

---

[422] AR 137.

[423] *Id.*

[424] *Id.*

[425] AR 145.

[426] AR 148.

[427] *Id.*

[428] *Id.*

[429] AR 149.

[430] AR 312–20.

[431] AR 312.

instructions because her thoughts wandered a lot.[432] She could pay attention for five to thirty minutes at a time.[433] She followed written instructions "pretty well" but did not follow spoken instructions well because of her less-than-good short-term memory.[434]

The plaintiff took care of her personal needs, grooming, medications, meals, laundry, shopping and housecleaning.[435] She did not cook and typically made sandwiches or microwave popcorn.[436] Her housemates complained that she did not contribute sufficiently to chores around the house.[437] She did not have the "energy or desire" to complete housework or yardwork.[438] She plaintiff went outside three to five times per week.[439] She managed her own finances.[440] She read daily, but got distracted and needed to take breaks.[441] She spoke to friends on the phone three to five times per week and attended AA meetings and outpatient recovery groups about three times per week.[442] She preferred to be alone and "rarely ha[d] the desire to spend time with others."[443]

Interactions with the police gave her anxiety but she otherwise got along "ok" with authority figures.[444] She did not handle stress well.[445] She used to deal with it by drinking alcohol, but after she became sober, she would just "shut down" when stressed.[446] The plaintiff required advance

---

[432] AR 316.

[433] Id.

[434] Id.

[435] AR 313–14.

[436] AR 313.

[437] Id.

[438] AR 314.

[439] Id.

[440] Id.

[441] AR 315.

[442] Id.

[443] AR 315–16.

[444] AR 317.

[445] Id.

[446] Id.

notice of changes in routine, sometimes got anxious around men, talked to herself occasionally, and found herself staring into space a lot.[447]

The plaintiff lived in a sober environment, saw a therapist, was diagnosed with PTSD, chronic depression, and anxiety and took psychiatric medications.[448] Her disorders and sobriety made it difficult for her to "function 'normally' on a day to day basis."[449] Both her "therapist and the county (from whom [she] received general assistance) deemed [her] unable to work for at least one year."[450]

Her daily activities typically included showering, grooming herself, going to outpatient addiction groups when necessary, reading, occasionally going to AA meetings, and going to sleep.[451] Before the alleged onset of her conditions, the plaintiff was able to "have a social life" and stay focused for "more than a few minutes at a time."[452] Her thoughts were always running and she struggled to tune them out and fall asleep.[453]

### 3. Administrative Hearings

### 3.1    Hearings Before to October 25, 2016

The plaintiff was found not disabled after two disability hearings, in decisions dated July 25, 2011 and February 6, 2012. On January 7, 2017. Judge Alis found that the plaintiff's circumstances changed such that the presumption of disability created by the prior ALJ denials was overcome but concluded that she was not disabled.[454]

---

[447] *Id.*

[448] AR 318.

[449] *Id.*

[450] *Id.*

[451] AR 319.

[452] *Id.*

[453] *Id.*

[454] AR 19.

### 3.2 Administrative Hearing Held October 25, 2016

#### 3.2.1 Pre-Hearing Memorandum

Before the October 25, 2016 hearing before the ALJ, the plaintiff's counsel submitted a brief to the ALJ.[455] He summarized the medical evidence and argued that the ALJ should find that she was disabled based on the five-step inquiry.[456]

#### 3.2.2 Administrative Hearing

At the hearing, the plaintiff's attorney asked the ALJ to reopen the plaintiff's prior claim for dysthymia based on new evidence regarding "depression, and anxiety, and post-traumatic stress disorder, which wasn't claimed in the prior application."[457] The ALJ determined that even though the plaintiff's previous SSI claim was denied, she would "take into account everything that I see in your record, as well as all the testimony that I've heard today both from you and the [VE], and then I will make my own independent determination."[458]

The plaintiff appeared and testified at the hearing.[459] The plaintiff's last job ended in October 2014 after six months.[460] She worked as an "educator" at a behavioral center for developmentally delayed adults and helped "two or three emotionally and mentally disabled adults" with skill development, grocery shopping, and "fun activities."[461] As part of the job, she was required to fill out paperwork and was typically responsible for two clients at a time.[462] The plaintiff was ultimately fired due to lateness, which the plaintiff testified was caused by her depression and "mental lapses," and "not very good looking paperwork."[463] She was between five and 20 minutes

---

[455] AR 345.

[456] AR 345–356.

[457] AR 58, 61.

[458] AR 101.

[459] AR 58.

[460] AR 67.

[461] *Id.*

[462] *Id.*

[463] AR 68.

late "at least twice a week."[464] The plaintiff rented a room at her father's house.[465] She had difficulty focusing when she got ready for work in the morning, because she would be "putting on socks, or something simple, and then look at the clock and five minutes have passed, and I'm still with the one sock on, and I don't know why. . . . I don't know, I just lose time."[466]

The plaintiff drove herself to work and sometimes drove 90 or so minutes away to Watsonville to watch her friend's dogs.[467] She did this a couple of times per year.[468] She fed, walked, and cleaned the dogs.[469]

When asked why she believed she was unable to work, the plaintiff said "[t]he main reason [was] the lapses."[470] She described the lapses as follows:

> I just go somewhere else in my head. It was actually brought up to me by an employer some years ago. I was given a performance review, and she said, you know, you're a great worker, and you're friendly, but sometimes you're working and you kind of slow down like your batteries are low, and you'll stop, and then you'll slowly start up and keep going.[471]

The plaintiff did this "all the time."[472] The plaintiff was unaware of when it happens, except when she notices that an activity took a particularly long time, or when the clock shows "five or ten minutes have passed."[473] She believed that her PTSD rendered her disabled.[474] She got "triggered by things" and would feel fearful of "commonplace" activities like "driving and someone almost runs into [her]."[475] That fear would then take her back the fear associated with the

---

[464] *Id.*

[465] *Id.*

[466] AR 69.

[467] AR 70.

[468] AR 71.

[469] *Id.*

[470] AR 72.

[471] *Id.*

[472] *Id.*

[473] *Id.*

[474] *Id.*

[475] AR 73.

rape she experienced in her twenties, the molestation she experienced as a child, or the abuse she endured from her mother.[476]

The plaintiff saw therapists on and off since the 1980s.[477] She attended therapy regularly starting in 2012 when she got sober.[478] At the time of the hearing, she had been seeing Eugenia Arnold for about six weeks and a psychiatrist (Liz Collins) about "once every six weeks to two months."[479] She took Gabapentin for anxiety and Prestiq for depression, which made her feel "stabilized."[480]

The plaintiff volunteered at the AA central office in Oakland and participated in AA meetings in the women's prison in Dublin.[481] She volunteered at the office once a week for a few hours per day, answering the phones and talking to members when they came into the office.[482] She volunteered at the prison once a month, to offer "support from the outside world."[483]

The plaintiff volunteered as the "back-up secretary" for AA meetings at Gladman Hospital, a psychiatric facility in Oakland.[484] She worked from 12 p.m. to 2 p.m., but typically arrived at 12:07 or 12:15 because she "just c[couldn't] get it together."[485] She tried "to give [herself] two full hours to – you know, from the time I get up to the time I have to leave the house. Like I said, sometimes I lapse out, getting dressed, or it will take me a really long time to find something to

---

[476] Id.

[477] Id.

[478] Id.

[479] AR 73–74.

[480] AR 74.

[481] AR 75.

[482] Id.

[483] AR 76.

[484] AR 75.

[485] AR 77.

wear. Not that I'm trying to look fantastic, or anything, just trying to make decisions, or something as simple as that, that takes a long time."[486] She drank "a lot of coffee."[487]

The plaintiff did not like to go home between volunteering and going to her own AA meetings because it took her "forever to get back out of the house," so she "stay[ed] out and [found] something to do, go to the library, or window shopping, or go to a coffee shop ad read a book, or something."[488] She could finish books and understand them, but sometimes had to re-read the same sentence or paragraph repeatedly to comprehend.[489]

The plaintiff first started experiencing depression in her teens.[490] She felt "[t]ired, low energy, low motivation, rather spaced out, feelings of worthlessness, not being good enough, insecurity issues, [and] self-esteem issues."[491] When asked what caused her depression, she cited being abused by her mother as a child, the two or three incidents of molestation she remembered experiencing as a seven or eight-year-old, and the rape she experienced in her early twenties.[492]

The plaintiff had trouble falling asleep.[493] In the weeks before the hearing, she fell asleep between 4:00 and 6:00 a.m.[494] She did not ever have any energy.[495] She felt worthless when she was around people, which led her to "spend as much time by [herself] as possible."[496] She tried to "keep the socializing to a minimum because there's too many trigger possibilities."[497]

---

[486] AR 77.

[487] AR 78.

[488] *Id.*

[489] AR 79, 81.

[490] AR 80.

[491] *Id.*

[492] *Id.*

[493] AR 82.

[494] *Id.*

[495] *Id.*

[496] *Id.*

[497] AR 83.

The plaintiff had not experienced thoughts of suicide lately.[498] When she got anxious, her heartrate increased, she felt "real tense feelings like [she] need[ed] to flee," and she tried to leave the place that triggered her as quickly as possible.[499] The plaintiff said that "almost anything" can trigger her.[500] "I heard a baby crying in Walgreen's one time, and for some reason it popped into my head I wonder if I cried like that when I was a little kid, and that – I started to kind of panic, and just – I just in my head was I got to get out of here."[501] She had flashbacks to her childhood abuse and her rape as a young adult.[502] She had difficulty concentrating while getting ready in the morning or reading.[503] Her brain was "trying to go other places on [her]." The plaintiff was late to her volunteer shift at AA approximately fifty percent of the time and on her long drives to Watsonville, she did not need to pull over or take breaks.[504]

### 3.3    Vocational Expert ("VE")

Thomas Linvill, a VE, testified at the hearing.[505] Mr. Linvill identified the plaintiff's past work positions according as follows: dog groomer (DOT code 418.674-010, medium work, SVP 4); sales clerk (DOT code 279.357-054, light work, SVP 3); barista or "counter attendant" (DOT code 311.677-010, light work, SVP 2); and program aide (DOT code 195.227-010, light work, SVP 6).[506] The VE said that the plaintiff did not perform "program aide" work at the SVP 6 level because she worked as a behavioral specialist only for about five months and therefore "was on the way to developing skills at that level, but did not work long enough to develop skills for that

---

[498] AR 84.

[499] *Id.*

[500] *Id.*

[501] AR 84–85.

[502] AR 85.

[503] *Id.*

[504] AR 86.

[505] AR 88.

[506] AR 88, 90.

level."[507] Instead, he ranked her time as a behavioral specialist at SVP level 3 or 4, the "semi-skilled range."[508]

The ALJ asked the VE whether a person — who "can perform work across all exertional levels" but is limited to "performing simply, routine tasks, but not at a production-rate," making only "simple work related decisions," and working in "stable work environment" that involves only minimal changes in the "day-to-day work setting, and in the tools and/or work processes that are used to accomplish the work" — could perform the plaintiff's past jobs.[509] The VE did not believe that a person with these limitations could work as a dog groomer, a retail salesperson, a program aide, or a barista.[510] A person with such limitations could work successfully in other positions, for example, as a kitchen helper (DOT code 318.687-010, medium work, SVP 2), a hand packager (DOT code 920.587-018, medium work, SVP 2), and a stapling-machine operator (DOT code 692.685-202, medium work, SVP 2).[511] The VE reported that there were 190,000 kitchen helper jobs, 450,000 packer jobs, and 40,000 stapling-machine operator jobs nationally.[512]

The ALJ asked a second hypothetical that was identical to the first except "this individual is limited to having frequent interactions with supervisors, coworkers, and the public, and those interactions with the public should be superficial in nature, and by that I'm talking about things like pleasantries, and greetings."[513] The VE offered the same DOT titles and did not adjust the numbers because of the change in the hypothetical.[514] The VE said, "the DOT doesn't clearly state the intensity of interaction with supervisors, and coworkers, and the public. . . that's the secondary

---

[507] AR 88.

[508] AR 89.

[509] AR 90.

[510] AR 91.

[511] *Id.*

[512] *Id.*

[513] AR 92.

[514] AR 93.

evaluation the vocational rehabilitation counselor needs to make when considering an occupational source."[515]

The ALJ asked whether, with respect to either hypothetical, there were any jobs that an individual who required hourly reminders to complete tasks could perform.[516] The VE responded that he believed this would likely be a "problem for sustaining employment" because it would lead the employer to question whether the individual could successfully do the work.[517]

She then asked whether an individual who arrives late to work "on a weekly basis two times a week up to five minutes late" could perform work.[518] The VE testified that the DOT does not offer guidance on the issue of lateness.[519] Based on his experience, he said that "missing five minutes of work a couple of times a week is not going to take away from work enough that a person couldn't be effectively productive on-the-job. So I would say at that level that [it] is going to irritate the employer, but it's not necessarily going to keep the person from working."[520] Assuming the individual was "suitably productive" throughout the rest of the day, she could perform the jobs that the VE listed for the first hypothetical.[521] If the individual were twenty minutes late to work twice a week, the VE said, "I don't think [missing 40 minutes of work per week] takes away enough time to keep productivity from happening" but the individual could be terminated if the employer counselled them to be punctual and they consistently failed to do so.[522] When pressed on this point by the plaintiff's attorney, the VE said that a person who is consistently late would be

---

[515] *Id.*

[516] *Id.*

[517] AR 94.

[518] *Id.*

[519] *Id.*

[520] *Id.*

[521] *Id.*

[522] AR 95.

"jeopardizing their employment" but being consistently late would not necessarily "preclude the employment."[523] He said that there is generally "some flexibility in terms of lateness."[524]

The plaintiff's attorney objected to Mr. Linvill's testimony regarding lateness as being contrary to what any other VE would say.[525] The ALJ overruled this objection.[526]

The VE noted that an individual that was off task for thirty percent of the day "is not going to meet minimum productivity requirements, and certainly is not going to be continued in the job."[527] The VE said that the DOT did "not make any statements about being off task" specifically.[528]

The plaintiff's attorney asked whether someone who missed four days a month was still employable.[529] The VE again noted that the DOT does not provide guidance on this point but said that from his experience, "allowable absence is at maximum about a day a month."[530] Someone who was absent four times a month would "certainly" be terminated.[531]

When asked whether someone who cannot maintain concentration for two-hour segments could sustain employment, the VE responded, "that's a problem that's going to impact productivity. . . [and] cause difficulty for that employee."[532] This would certainly put the employee in jeopardy of losing his or her job.[533]

---

[523] AR 97.

[524] AR 99.

[525] Id.

[526] AR 100.

[527] AR 96.

[528] Id.

[529] Id.

[530] AR 97.

[531] Id.

[532] AR 100.

[533] AR 101.

### 3.4    The ALJ Decision

On January 5, 2017, the ALJ issued an unfavorable ruling.[534] The prior decision by Judge Sleater "create[d] an ongoing presumption that the claimant was able to work beyond the date of that decision . . . ."[535] "After careful consideration of all the evidence," the ALJ found that the plaintiff "made a showing of 'changed circumstances' rebutting the presumption of continued non-disability following the prior decision."[536] The ALJ followed the five-step sequential-evaluation process to determine whether the plaintiff was disabled and concluded that she was not.[537]

At step one, the ALJ found that the plaintiff engaged in substantial gainful activity when she worked at the Harambee Kinship Center from May 2014 to October 2014.[538] During that period, she made roughly $1,488.89 per month, which was well over the $1,070 need to show substantial gainful employment.[539] There was less than 12 months between the alleged onset date, which was amended to the date of her filing (August 14, 2013) and the start of her employment at the Kinship Center, precluding a finding of disability before November 1, 2014.[540] After November 1, 2014, there was a continuous twelve-month period when the plaintiff did not engage in substantial gainful activity, meaning that the plaintiff's application was not completely precluded at step one.[541]

At step two, the ALJ found that the plaintiff had severe impairments that significantly limited her ability to perform basic work activities: "a depressive disorder, a posttraumatic stress disorder, and an anxiety disorder (20 CFR 416.920(c))."[542]

---

[534] AR 15–29.

[535] AR 19.

[536] *Id.*

[537] *Id.*

[538] AR 20–21.

[539] AR 21.

[540] *Id.*

[541] *Id.*

[542] *Id.*

At step three, the ALJ found that the plaintiff "[did] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments": 12.04 (affective disorders) or 12.06 (anxiety related disorders).[543] To make this finding, the ALJ considered whether the "paragraph B" criteria were satisfied.[544] To satisfy this criteria, a plaintiff would have to show that her mental impairments result in two or more of the following: "marked restriction of the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."[545] Based on the record and hearing, the ALJ found that the plaintiff had no restriction in the activities of daily living because she lived independently, did chores around the house, and could walk, drive, shop, read, interact with friends, and attend AA meetings and medical appointments.[546] The ALJ found that the plaintiff had moderate difficulties with social functioning and concentration, persistence, and pace because she was able to interact with others and reads and can comprehend what she reads.[547] The plaintiff did not experience any episodes of decompensation of an extended duration.[548]

The ALJ determined that the plaintiff had the residual-functional capacity to perform a "full range of work at all exertional levels but with the following nonexertional limitations: the claimant was limited to simple, repetitive tasks with simple work-related decisions in a stable work environment, meaning few changes, if any, in the day-to-day work setting."[549] She could have only "superficial" frequent interactions with customers, co-workers, and supervisors and "could not perform work at a production rate."[550]

---

[543] *Id.*

[544] *Id.*

[545] *Id.*

[546] AR 22.

[547] *Id.*

[548] *Id.*

[549] *Id.*

[550] *Id.*

To make this determination, the ALJ considered the plaintiff's symptoms, finding that "[the plaintiff's] medically determinable impairments reasonably could be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."[551]

The ALJ determined that the opinion of Martha Hunt, LMFT, had "no probative value" because it was written "long before the amended alleged onset date."[552] The ALJ assigned little weight to Dr. Franklin's December 2013 report because after the report issued, the plaintiff was able to obtain a SGA-level job, undercutting the opinion that she had marked or extreme symptoms.[553] The ALJ assigned no weight to her July 14, 2014 opinion because "it [was] contradicted by the claimant's ability to work at the SGA level."[554] The ALJ assigned little weight to Dr. Franklin's September 29, 2016 opinion because it was "internally inconsistent and inconsistent with treatment records."[555] For instance, Dr. Franklin found that the plaintiff would have marked to extreme difficulties following even simple instructions and maintain her focus, even though the plaintiff performed well on the administered tests and was able to maintain concentration and answer questions with good recall and memory throughout the testing.[556]

The evidence from Pathways to Wellness suggested that the plaintiff was no more than "moderately limited" by her conditions.[557] The ALJ took these limitations into account, noting, for example the plaintiff's "ability to handle only simple tasks," her inability to withstand "tight

---

[551] AR 23.

[552] AR 24.

[553] Id.

[554] AR 25.

[555] AR 26.

[556] Id.

[557] AR 25.

production-rate work assignments," her inability to handle more than "limited changes in the work setting," and her inability to handle more than mere superficial interactions with others.[558]

The ALJ found the opinion of therapist Cheryl Crenshaw inconsistent with the medical record because she opined that the plaintiff had marked symptoms even though the plaintiff's primary treating source at Pathways to Wellness reported GAF scores that indicated only moderate symptoms.[559] The ALJ accorded Eugenie Arnold's opinion little weight for the same reason.[560]

Overall, the ALJ assigned the greatest evidentiary value to the treatment records.[561] In addition to evaluating the records, the ALJ noted that the plaintiff's ability to engage in "regularly daily activities and social interactions" informed the decision.[562]

At step four, the ALJ found that the plaintiff was unable to perform any past relevant work because those positions exceeded the residual functional capacity assessed for the plaintiff.[563] The VE's testimony informed this decision.[564]

At step five, the ALJ took into account the plaintiff's age (she filed her application at age 43, rendering her a "younger individual"), education (she had at least a high-school education), work experience, and residual-functional capacity and determined that "there [were] jobs that exist in significant numbers in the national economy that the claimant [could] perform."[565]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

---

[558] Id.

[559] AR 26.

[560] Id.

[561] Id.

[562] AR 27.

[563] Id.

[564] Id.

[565] AR 27–28.

are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that. . . she is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1099 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is

entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff contends that the ALJ erred by (1) incorrectly evaluating the medical-opinion evidence, (2) failing to properly consider the plaintiff's dissociative and personality disorders at step two, (3) not basing her step three findings on substantial evidence, (4) failing to credit the plaintiff's testimony, (5) not basing the RFC on substantial evidence, and (6) not basing the step five employability finding on substantial evidence. The plaintiff seeks remand for payment of benefits or, in the alternative, for further proceedings.

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands for further proceedings.

## 1. Whether the ALJ Erred by Incorrectly Evaluating Medical-Opinion Evidence

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews v.*

*Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).[566] In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal punctuation and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. §404.1527). Social Security regulations distinguish between three types of accepted medical-sources: (1) treating physicians; (2) examining physicians; and (3) non–examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *accord Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing

---

[566] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, applies based on the date of the ALJ's hearing, November 16, 2016.

1    specific and legitimate reasons that are supported by substantial evidence.") (internal quotation

2    marks and citation omitted).

3          In addition to the medical opinions of the "acceptable medical sources" outlined above, the

4    ALJ must consider the opinions of other "medical sources who are not acceptable medical sources

5    and [the testimony] from nonmedical sources." 20 C.F.R. § 414.1513(a). The ALJ is required to

6    consider observations by "other sources" as to how an impairment affects a claimant's ability to

7    work, *id.*; nonetheless, an "ALJ may discount the testimony" or an opinion "from these other

8    sources if the ALJ gives . . . germane [reasons] for doing so." *Molina,* 674 F.3d at 1111 (internal

9    quotations and citations omitted). An opinion from "a medical source who is not an acceptable

10   medical source may outweigh the medical opinion of an acceptable medical source." 20 C.F.R. §

11   404.1527(f)(1). "For example, it may be appropriate to give more weight to the opinion of a

12   medical source who is not an acceptable medical source if he or she has seen the individual most

13   often than the treating source, has provided better supporting evidence and a better explanation for

14   the opinion, and the opinion is more consistent with the evidence as a whole." *Id.*

15         The plaintiff argues that the ALJ incorrectly weighed the medical-opinion evidence. The court

16   agrees, and grants the plaintiff's motion.

17   **1.1      The State Agency Psychological Consultants**

18         The plaintiff argues that the ALJ erred by failing to "mention or weigh" the opinions of the

19   state agency psychological consultants.[567] The court agrees.

20         The ALJ did not mention the DDEs or the medical opinions of the non-examining state-agency

21   psychiatrists at all in the opinion.[568] "An ALJ is required to consider as opinion evidence the

22   findings of the state agency medical consultants; the ALJ is also required to explain in his decision

23   the weight given to such opinions." *Sawyer v. Astrue,* 303 Fed. Appx. 453, 454 (9th Cir. 2008)

24   (citing 20 C.F.R. § 416.927(f)(2)(i)). An ALJ "may not ignore" the opinions of state agency

25

26

27   [567] Mot. – ECF No. 28 at 9.

28   [568] *See* AR 19–29 .

medical consultants "and must explain the weight given to the opinions in their decisions." SSR 96–6p (1996), 1996 WL 374180, at *2 (S.S.A. 1996).

Here, the court remands for the ALJ to consider the opinions of the state-agency psychologists.

### 1.2 Lesleigh Franklin, Ph.D.

The plaintiff argues that the ALJ rejected the opinions of Dr. Franklin without providing "specific or legitimate reasons" for doing so.[569] Dr. Franklin conducted full evaluations of the plaintiff twice, once on December 13, 2013 and again on September 29, 2016.[570] Dr. Franklin also wrote an opinion on July 14, 2014.[571]

The ALJ gave "little weight" to Dr. Franklin's first assessment that the plaintiff's mental-health symptoms "could interfere markedly with appropriate work functioning" because "the claimant was able to recover sufficiently within a few months and obtain a regular SGA-level job."[572] The ALJ said the following about Dr. Franklin's second opinion:

> [Dr. Franklin] opined that the claimant would likely miss more than four days of work per month due to her symptoms, she would have marked difficulty with attendance and completing a normal workday, and she would have extreme difficulty dealing with normal work stress. She also would have marked difficulties setting realistic goals. Apparently, unknown to Dr. Franklin, the claimant was then working at the SGA level, demonstrating that the claimant's work limitations were not as extreme as Dr. Franklin predicted. This opinion is assigned no weight because it is contradicted by the claimant's ability to work at the SGA level, is based on an evaluation that was then six months old, and is from the period prior to November 2014, when the claimant stopped work at the SGA level.[573]

Finally, in her September 29, 2016 opinion, Dr. Franklin found that the plaintiff would have marked to extreme difficulties in work-related areas such as carrying out simple instructions, completing a normal workday, and maintaining regular attendance.[574] The ALJ assigned this

---

[569] Mot. – ECF No. 28 at 10.

[570] AR 24–25.

[571] AR 25.

[572] AR 24.

[573] AR 25.

[574] AR 26.

opinion little weight because it was "internally inconsistent and inconsistent with treatment records."[575] The ALJ explained: "[i]t is unclear on what basis these conclusions could be drawn; the claimant was able to maintain attention and concentration for the interview, answer all questions with good recall and memory, and performed well on testing. Her treating sources indicated improvement with medications and did not describe marked symptoms."[576]

That the plaintiff participated in SGA-level employment during her alleged disability period can be "a clear and convincing and legitimate reason to discount the opinions of [an examining doctor] that the severity of [the p]laintiff's mental impairments prevented her from working." *Colbert v. Berryhill*, No. EDVC 16–2613–KS, 2018 WL 1187549, at *10 (C.D. Cal. Mar. 7, 2018). But, here, the ALJ ignores the fact that the plaintiff was fired from her SGA-level job due to some of the limitations that Dr. Franklin described (namely, tardiness and attendance issues and an inability to properly complete paperwork).[577] This undermines the ALJ's rationale for discounting Dr. Franklin's first two opinions. The court finds that the ALJ's reliance on the plaintiff's ability to hold an SGA-level job for some measure of time was not a clear and convincing reason for rejecting Dr. Franklin's opinions.

As for Dr. Franklin's September 29, 2016 opinion, "[m]erely stating that a treating physician's opinions are not supported by objective findings is insufficient." *Morganti v. Colvin*, No. C 12–03511 CRB, 2013 WL 1758784 at *6 (N.D. Cal. Apr. 24, 2013) (citing *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings. . . does not achieve the level of specificity our prior cases have required."). To disregard a treating physician's opinion, the ALJ must provide "a thorough summary of the facts, *his interpretations thereof,* and his findings." *Id.* (emphasis in original). The ALJ did not provide the requisite specificity here.

---

[575] AR 26.
[576] *Id.*
[577] AR 68.

Additionally, that the plaintiff maintained attention, performed well on testing, and showed improvement are not clear and convincing reasons to discount Dr. Franklin's testimony The Ninth Circuit has emphasized that "while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Id.* Incidents of improvement must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id.* (citation omitted). "Caution in making such an inference is especially appropriate when no doctor or other medical expert has opined. . . that a mental health patient is capable of working or is prepared to return to work." *Id.* at 1017–18.

The ALJ erred by failing to properly weigh Dr. Franklin's opinions about the limitations posed by the plaintiff's mental illnesses.

### 1.3 Martha Helms, LMFT

The plaintiff contends that the ALJ erred by failing to consider or discuss Martha Helms's opinion, completed on January 17, 2013, indicating that the plaintiff's mental impairments precluded employment for at least one year, and that the plaintiff had multiple moderate to marked functional limitations.[578] Because Ms. Helms qualifies as an "other medical source," the ALJ was required to give "germane" reasons for discounting her opinion. *Molina,* 674 F.3d at 1111 (internal quotations and citations omitted).

The ALJ gave no weight to Ms. Helms's opinion because it was generated "long before the amended alleged onset date" and so it "had no probative value."[579] Treatment records that predate the alleged onset date "are not probative evidence of [the] plaintiff's functional impairments at the time [the plaintiff] allegedly became disabled." *Thomas v. Colvin,* No. 2:14-cv-1878-EFB, 2016 WL 1267935, at *3 (E.D. Cal. Mar. 30, 2016) (citing *Carmickle v. Comm'r Soc. Sec. Admin.,* 533 F.3d 1155, 1164-65 (9th Cir. 2008) and *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988)). This was a germane reason to discount this pre-onset-date opinion.

---

[578] Mot. – ECF No. 28 at 12.

[579] AR 24.

**2. Whether the ALJ Erred by Failing to Consider Whether or Not the Plaintiff's Personality Disorder and Dissociative Disorder Were Severe Impairments at Step Two**

The plaintiff argues that the ALJ erred by failing to mention or assess her personality disorder and dissociative disorder diagnoses.[580] The court agrees.

At step two of the five-step sequential inquiry, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ must consider the record as a whole, including evidence that both supports and detracts from its final decision. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). An impairment is not severe if it does not significantly limit the claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b). To determine the severity of a mental impairment specifically, the ALJ must consider four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a.

"[T]he step two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153–54 (1987)). Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work." *Id*. (internal quotation marks omitted) (citing SSR 85–28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988)).

Here, the ALJ did not mention either the plaintiff's dissociative or personality disorders at step two.[581] In *Lockwood v. Colvin,* the plaintiff was diagnosed with "anxiety disorder, personality disorder, borderline traits, manic depression, acute stress disorder, and dissociative disorder." No. 12–cv–00496–NJV, 2013 WL 1964923, at *7 (N.D. Cal. May 10, 2013). The ALJ "referenced various diagnoses of anxiety disorder, borderline traits, panic attacks and dissociative disorder,"

---

[580] Mot. – ECF No. 28 at 13.

[581] *See* AR 19–29.

but "did not evaluate whether they were severe." *Id.* The court held that "to the extent the ALJ's failure to address these impairments can be interpreted as a conclusion that these impairments are not severe, the ALJ failed to . . . explain why the conditions were not severe." *Id.*

Similarly here, the ALJ was not required to find that the diagnoses were in fact severe impairments, but his failure to discuss them at all is reversible error.

### 3. Whether the ALJ Erred by Finding that the Plaintiff's Impairments Did Not Meet or Equal a Listing at Step Three

At step three of the five-step framework, "[i]f a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the "Listing of Impairments," then the claimant is presumed disabled." *Lewis*, 236 F.3d at 512 (citing 20 C.F.R. § 404.1520(d)). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Id.* (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)). "Medical equivalence will be found 'if the medical findings are at least equal in severity and duration to the listed findings.'" *Marcia*, 900 F.2d at 175–76 (quoting 20 C.F.R. § 404.1526). Accordingly, at step three, "the ALJ must explain adequately his evaluation of the alternative tests and the combined effects of the impairments" to determine whether a claimant equals a Listing. *Id.* at 176.

Because the court finds that the ALJ erred by weighing the medical-opinion evidence, including opinion evidence that supported one or more listings, the court remands for reconsideration of this issue as well.

### 4. Whether the ALJ Erred by Improperly Rejecting the Plaintiff's Testimony

The plaintiff argues that the ALJ used "boilerplate" language and failed to identify which parts of the plaintiff's testimony, if any, were inconsistent with the medical record or otherwise not credible.[582] The court agrees.

---

[582] Mot. – ECF No. 28 at 15.

United States District Court
Northern District of California

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found the following about the plaintiff's testimony:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments reasonably could be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.[583]

The ALJ satisfied the first step of the two-step inquiry when he determined that the plaintiff's medically determinable impairments "reasonably could be expected to cause some of the symptoms alleged."[584] *See Molina*, 674 F.3d at 1112. But the ALJ did not provide any evidence or

---

[583] AR 23.

[584] *Id.*

find that the plaintiff was a malingerer. Indeed, her testimony is consistent with the medical-opinion evidence in the record. Accordingly, the ALJ needed to provide "specific, clear, and convincing reasons" for rejecting the plaintiff's testimony regarding the severity of her symptoms. *Id.* (internal quotation marks and citations omitted).

Because the ALJ discredited the plaintiff's testimony in part on his assessment of the medical-opinion evidence, including Dr. Franklin's medical opinion, the court remands on this ground too. The ALJ can reassess the plaintiff's credibility in context of the entire record.

### 5. The ALJ's Findings at Steps Four and Five

The plaintiff argues that the ALJ's findings at steps four and five were not supported by substantial evidence.[585] The ALJ found that the plaintiff had the following RFC:

> After taking into consideration all of the factors, I conclude that she should be able to sustain the demands of regular competitive work that is simple and repetitive, with simple work-related decisions and not requiring fast-paced production work. To address her anxiety, she should be limited to work with few changes. Finally, to address her concerns about interactions with others, she should be limited to superficial interactions, although she is able to handle more intensive interactions at least once a week through AA.[586]

At step five, the ALJ determined that "considering the [plaintiff's] age, education, work experience, and residual functional capacity, there [were] jobs that exist[ed] in significant numbers in the national economy that the plaintiff [could] perform."[587]

Because the court remands for a reweighing of medical-opinion evidence and the plaintiff's testimony, and because the past-relevant-work and RFC determinations are based on those assessments, the court remands on this ground.

---

[585] Mot. – ECF No. 28 at 15–17.

[586] AR 27.

[587] AR 28.

### 6. Whether the Court Should Remand for Further Proceedings or for Determination of Benefits

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1076 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

For the reasons described above, the court finds that remand is appropriate so as to "remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d at 635 (alteration in original)).

## CONCLUSION

The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: August 2, 2019

_____
LAUREL BEELER
United States Magistrate Judge